COCA–COLA BOTTLING COMPANY OF STEAMBOAT SPRINGS, a Corporation, Appellant,

v.

The COCA–COLA COMPANY, a Corporation, Appellee.

No. 623–69.

United States Court of Appeals, Tenth Circuit.

Nov. 23, 1970.

On Rehearing Sept. 8, 1971.

C., Denver, Colo., on the brief), for appellant.

Raymond J. Turner, Denver, Colo. (Dawson, Nagel, Sherman & Howard, and John C. Mitchell, III, Denver, Colo., on the brief), for appellee.

Before BREITENSTEIN and SETH, Circuit Judges, and TEMPLAR, District Judge.

SETH, Circuit Judge.

This damage action for breach of contract was brought by the appellant corporation which held a franchise from the defendant, The Coca-Cola Company. The case was tried to the court which found for the defendant.

On this appeal the plaintiff urges that the evidence does not support the finding of the trial court that there was a mutual cancellation of the bottling contract and the contract covering the purchase and handling of pre-mix Coca-Cola syrup. Plaintiff also argues that the defendant wrongfully breached the contracts by terminating shipments to it of Coca-Cola syrup.

The record shows that plaintiff and its predecessor for many years had operated a bottling plant for soft drinks at Steamboat Springs, Colorado. It held an exclusive franchise to bottle and distribute Coca-Cola in certain counties in Colorado, and to distribute Coca-Cola in pre-mix vending machines in the same area. Other brands of soft drinks were bottled in its plant, and distributed in the local market area. The president of the corporation at the time in question had been in such capacity since 1960 and he and his family owned all the corporate stock. An expansion of the bottling plant was undertaken in 1960 and financial problems thereupon arose. The records of inspections made by the Quality Control Department of The Coca-Cola Company during the period 1960–1963 showed deficiencies in the bottled product, including foreign material; they also described unsanitary and unsightly conditions in and around the plant.

William J. Hunsaker, Denver, Colo. (Johnson, Makris, Simon & Sterling, P.

In the summer of 1963 the quality control reports showed no improvement in conditions at the plant or of the product, and by September there was found foreign material in about one-third of the bottled samples examined. The financial problems of plaintiff continued, and the record shows that plaintiff was not paying on a regular basis for syrup purchased from defendant. The account became delinquent, and at least one insufficient fund check was sent in payment of the account. On September 17, 1963, the defendant refused to make any further shipments of syrup to plaintiff, and so advised its president. Several discussions were had about the matters over the telephone between plaintiff's president and the officials of defendant. A meeting was then arranged for October 3, 1963.

At the October 3d meeting two representatives of defendant went to Steamboat Springs and met with the president of the plaintiff. At this meeting the quality deficiencies, the delinquent syrup account, and plaintiff's general financial problems were discussed. They also discussed who would serve the territory if the franchise contracts were terminated. Plaintiff's president said he would like to see it served by one of his two brothers who had bottling plants in adjoining areas. The representatives of defendant suggested that the franchise contracts be surrendered to them by plaintiff in order that the transfer of the territory to one of the brothers could be facilitated. The president of plaintiff then handed the contracts to the representatives of defendant. The contracts were sent to defendant's home office, marked "cancelled," and returned to plaintiff on October 7th. There was no further correspondence about them by either party. Plaintiff's president testified that he did not intend to cancel the agreements at the October 3d meeting, and there was no such mutual understanding.

The territory of plaintiff was soon after the meeting transferred by defendant to the brother of plaintiff's president who had a plant at Vernal, Utah. This transferee assumed liability for the unpaid syrup account of plaintiff, and ultimately paid it.

By an entry of October 11, 1963, on the books of plaintiff the unpaid syrup account owing defendant was closed with the notation: "Liability for Coke syrup assumed by Coca-Cola Bottling Company of Vernal, Utah in consideration of transfer of the Coca-Cola Franchise." At about this same time the plaintiff wrote to defendant about the syrup account indicating that the Vernal company was to pay it.

On the day of the meeting between the parties, after consultation by its president with its attorney, the plaintiff corporation executed conveyances of most of the corporate property to the wife, sons, and daughter of the president. The plaintiff continued to bottle other soft drinks for some eighteen months after the October 3d meeting, but the plant was taken over by creditors under a writ of attachment.

█ The trial court found that the franchise contracts between the parties were mutually cancelled on October 3, 1963. This finding is supported by the record which shows the discussion about cancellation; about who would serve the territory; about the desire that the Vernal company serve it, and about the physical surrender of the documents with their subsequent return marked "cancelled" without further comment. This was followed by the granting of the territory to the Vernal company, its payment of the delinquent syrup account, and plaintiff's inaction for an extended period of time. A suit was filed a year later in a Colorado State court, and later dismissed. Thus the record supports the trial court's finding of mutual termination of the contracts on October 3, 1963. See Glens Falls Ins. Co. v. Newton Lumber & Mfg. Co., 388 F.2d 66 (10th Cir.).

█ The party asserting mutual termination has the burden of proof in Colorado, Western Air Lines v. Hollen-

beck, 124 Colo. 130, 235 P.2d 792, and defendant met this burden. The evidence brings the case within Equitable Life Ins. Co. v. Verploeg, 123 Colo. 246, 227 P.2d 333, which recognizes the right to initiate a mutual rescission even wrongfully and holds it to be effective if the other party agrees. See also, Wallick v. Eaton, 110 Colo. 358, 134 P.2d 727.

The plaintiff urges that the contracts had previously been wrongfully breached by defendant on September 17, 1963, when it discontinued shipments of Coca-Cola syrup to plaintiff. As to this point the trial court found that this action by defendant did not give rise to any liability; that the termination of shipments was by reason of plaintiff's failure to pay its syrup account which was then delinquent. The record also supports this finding. The testimony of the witnesses for defendant was that shipments were stopped by reason of the failure to meet the sanitary or quality standards and also by reason of the delinquent account. We hold that the trial court's conclusion was correct that shipments could be stopped when the account was past due.

■ The contract contained no particular provision for a remedy if the syrup account was unpaid. Nor did it say when the syrup was to be paid for other than by cash or bill of lading attached. The termination provision was a general one providing for thirty and sixty day notices of breach of contract. The trial court's conclusion of law that the shipments were stopped for non-payment, and by inference could properly be so stopped, is in accordance with the authorities from other jurisdictions. These hold that this is an available remedy which may be used by the vendor under such circumstances. There appear to be no Colorado authorities in point, and we hold that the trial court's determination of State law on this subject is well within the general authorities and not clearly erroneous. The

plaintiff cites no cases to the contrary. Under these circumstances we will follow the trial court's conclusion. Bushman Construction Co. v. W. S. Conner Const. Co., 351 F.2d 681 (10th Cir.).

The plaintiff argues that the account was not really delinquent after all by reason of a credit policy expressed in a letter from defendant to plaintiff. We find no support for such an interpretation of the letter in question. Furthermore the contract provisions permitting shipment of syrup with bill of lading attached was not utilized by defendant nor requested by plaintiff and did not become pertinent.

Affirmed.

## ON REHEARING

The plaintiff-appellant has filed a motion for rehearing which has been granted for a rehearing on the briefs only. The court has thus given further consideration to the issues raised and has filed this Opinion on Rehearing.

By petition for rehearing, the plaintiff has strongly urged that in our previous consideration we did not treat the provisions in the contract relating to notice for termination of the agreement. These provisions, however, never became operative by reason of the rescission of the contract as discussed in the original opinion, and the point was not therein mentioned.

■■ Under the applicable section of the Uniform Sales Act as adopted by Colorado, which was section 155-2-612, Colo.Rev.Stat.1963, it was provided that the circumstances would determine whether an "injured" party need proceed further under an installment contract. The trial court made a finding of fact in part as follows:

"The Court further finds that plaintiff's financial condition was such that it would have been a useless act, for on September 12, 1963, five days before

the stop order on further shipments was made by the defendant, the plaintiff had issued its check to the defendant for $1,848.15, which was returned marked 'insufficient funds.' "

Under the trial court's findings it is apparent that the seller was justified in so withholding further performance on September 17, 1963, until some solution could be reached for the previous failure of plaintiff to pay. See the official comment under the present Uniform Commercial Code at 155–2–612 C.R.S.1963, as well as the express provisions of the Uniform Sales Act formerly 121–1–45, C.R.S.1963. This solution was sought by the parties in their conference, and was agreed upon at the meeting of October 3, 1963, when the contract was mutually rescinded. This rescission thus came before either party had taken any formal action to terminate the contract or to seek other remedies. Under these circumstances the contract provisions permitting *termination of the contract* after notice never became operative. The termination of *shipments* on September 17, 1963, and the meeting of the parties at which the mutual rescission was agreed upon were really both part of the same transaction—the mutual termination of the relationship.

The plaintiff in its motion and authorities for rehearing cites Carleno Coal Sales, Inc. v. Ramsay Coal Co., 129 Colo. 393, 270 P.2d 755, where the court considered the importance of notice provisions prior to *contract* termination or other remedies in an agency contract, and Northwest Water Corp. v. City of Westminster, 164 Colo. 61, 432 P.2d 757, where the Colorado court again considered notice provisions relating to contract termination. The point as to notice the plaintiff argues is not pertinent to the issues, and the above cited cases are not applicable to the facts in this case where there was no contract termination other than by the mutual rescission.

*Affirmed.*